and Lori Epkins v. Connie Woodford et al. Mr. Jackson, you are here for the appellant, sir? I am, Your Honor. Benjamin Jacoby, you are here? Yes, Your Honor. Okay, Mr. Jackson, please proceed, sir. Thank you, Your Honor. May it please the court. This appeal really is about the remaining count in the complaint filed by Lori Epkins against the county, and Mr. Pete Lambie, who is now deceased. And it's the intentional infliction of a mental distress count. And it was dismissed, of course, by the circuit court against both the, both of the defendants. I understand that 2-107 of the Tort Immunity Act excludes the county as an entity from any liability related to slander actions, and of course, the slander action itself was extinguished as a result of Mr. Lambie's death. And I also understand that 2-109, that the county itself is not liable unless the employee is liable for any acts which may violate a person's rights. But what I don't understand, and we dismissed the intentional infliction of mental distress count both against the county and against the estate of Mr. Lambie. Under the Survival Act of the State of Illinois, the intentional infliction of mental distress count does survive the death of someone who This case was dismissed pretty much based on two decisions, both of them coming out of the Northern District of Illinois, both of them memorandum opinions. One called Schodor, and the other one called Kertowski. And the language in those two cases picks up some that the intentional infliction of mental distress count is rooted in the defamation count, therefore, it doesn't survive. Well, in my judgment at least, that would conflict with the Illinois statute. I understand that federal decisions are instructive, but they're not controlling. And that would seem to me to be in conflict with our own statute, which says that that count survives. But those two decisions, and quite frankly, I've not been able to find other than in those two decisions of now the case in Woodford County, where that rooted in language has been used to dismiss an intentional infliction case anywhere else. So we're arguing that, first of all, the county should not have been dismissed with respect to the intentional infliction of emotional distress count. And the state, of course, should not have been dismissed since they don't really enjoy the protections that the county actually is understandably meant to allow public officials to function in a way that they don't have to be afraid of being sued. And that's a good thing. I don't quarrel with that. But it doesn't, and Illinois has long held, it doesn't protect bad acts of political victims. While they are called employees of the entity, the public entity, they have to be working within the scope of their employment to enjoy the protections of the Tort Immunity Act. If they're working outside the scope of their employment, then, of course, they can be responsible, as well as the county, the public entity can be responsible for their bad acts. We believe in this case that the evidence, there is a material issue of fact in this case as to whether Mr. Lamby was, in fact, acting within the scope of his employment when he accused the plaintiff in of ill repute and of having sexual relations with a member of a public body in Tazewell County, and did it publicly in the county offices and several other places within Woodford County and Tazewell County. Well, wasn't there some other aspect of this, I thought, that your client had claimed that she was sick or something or unable to work or this was supposedly going to be working time when she was with this guy in Tazewell County? Wasn't there some aspect of that? Or maybe I misunderstood. No, I think there's some discussions about that, but she was in charge of the assessor's office. She actually was the assessor for the county, worked directly for the county board. And so she didn't have an eight-hour day job. She had the ability to take time off pretty much when she needed it, But that, while that allegation was out there, there really isn't any evidence at this point in time. Unfortunately, in this case, with the death of Mr. Lamby, we didn't get the complete discovery. So whether or not that was a provable fact was not pursued, quite frankly. But yes, there was that There's no question that she had a relationship, and when I say familiarity, with the person, Mr. Unson. But they were friends. He had a public position, and so did she, in another county. And she had previously worked in Tazewell County, so she knew him well. But that certainly didn't give anybody the right to accuse either one of them of engaging in the sort of conduct to which they were accused. We believe that the use of the rooted-in language is not a doctrine that has been adopted by the state of Illinois, except in my opinion, except in this particular case. And we believe for those reasons, in this case, should be reversed and sent back for a hearing on the merits. I mentioned that we have argued all along that Mr. Lamby was not in the scope of his employment. That's the key. If he was doing an act that was what he was elected to do, in a place where he was elected to do it, and was doing it for the good of the county, that would be one thing. That would be an act that was done within the scope of his employment. But in this case, that was not the case. He rushed in... Why wasn't it the case? Because he rushed into the county offices at a time when he was not in the county meeting. In the middle of the day, he gets this letter from somebody in Tazewell County, and he takes it in and weighs it among all the employees in the county. You know, she's shacking up with this guy. She's having an affair with him. I don't condone anything that Mr. Lambkin may or may not have done with regard to that. It was handled poorly at best. But as I understand it, if you're elected to the county board, there are no set hours of your employment. You have theoretical responsibility for the county 24-7 during the length of your term. Well, and I don't disagree with that to some extent, but applying that theory to this case, he certainly was not in charge of reporting the private business of employees or anybody else to other employees. Obviously, if he was a member of the employment committee for the county, and he got this information, it seems to me it would be within the scope of his employment if he told the committee what he had found out. But there wasn't anything these employees could do about it. They were subservient to Ms. Lambkin. They worked for her, and to report to them certainly would not have been in the course of his business, and it also was not in any way enhancing the business of the county. He was there simply to be disruptive, and under the circumstances, I think that's a factual situation to try a fact on the determinant rather than in summary judgment. So, well, for the reasons that I've stated in my briefs as well as in this argument, we would urge the court to reverse this decision and have a hearing on the merits of just the III. I understand we're just in court on the intentionally inflicted mental distress issue. I understand the rest of it was dismissed as a result of his death. Okay. Thank you, counsel. Thank you, Your Honor. Mr. Kirby. Thank you, Your Honor. May it please the court. Counsel. Appellant's counsel is correct. We are limited to one issue in this case, and that is whether the circuit court properly found that Woodford County and Pete Lambie were immune under the Tort Immunity Act. The circuit court found that Woodford County was immune under Section 2107, and Lambie was immune under Section 2210. Appellant's opening brief doesn't come to issue with the circuit court's interpretation of those statutes. And so to the extent that she argues that the court wrongly interpreted those statutes or applied it wrongly in this case, I think she's weighed that argument. What she did bring up in her brief was whether or not Lambie was within the scope of his employment when these acts took place. And that is dispositive on the complaint itself, the face of the complaint. I dispute somewhat the slant of the facts that were presented here, but I'm not going to nitpick the details there. And the appellant's brief also focuses heavily on 2201 of the Tort Immunity Act, but that wasn't decided by the circuit court. So unless your honors seek input from me on that section, I'm not going to discuss that much either. So the primary issue is that Lambie told people in plaintiff's office that she was having an adulterous affair and was shacking up with Hunsicker? The primary issue is whether or not he was acting within the scope of his employment. First of all, is that what he said? I think the evidence indicates at this point that he went in there. He took the letter into the office. He showed it to one employee but didn't say anything. He took the other employee, met her in a conference room, showed her the letter, and he said that Laurie was shacking up with Hunsicker. He also said that he also asked her whether or not she knew anything about the termination of this guy Chad, that the letter sort of alleges that he was terminated possibly of property or against policy. And that's pretty much the extent of that conversation. The letter raised other issues. Did he also say that she was having an adulterous affair? No. Outside of the interpretation of the words shacking up with, and that's open to interpretation as well, the only thing he said was he's shacking up, she's shacking up with Hunsicker. And then he asked about Chad, whether or not she knew anything about that firing. He then said that he had to take this letter to Greg Jackson because he felt he had to. Is there some issue about whether or not she reported that she was sick on the day she was supposedly with Hunsicker? That was brought up in the letter. In the letter it says that she played hooky, she called in sick, she went to the Tazewell County office, left with some friends, and then later that night her car was seen at Hunsicker's house, and it did not leave until the next morning. A fact, by the way, that she concedes in her deposition. So there were issues of her employment at that time. So the Lambie, those are the points that he knew of? That's what was in the letter. And that's why he took the letter to her office, to sort of seek answers, I would say. There was an investigatory purpose. What were the answers he was seeking? Well, to figure out if there was any truth to possible calling in sick on days when she wasn't sick, not fulfilling the duties of her job, things that might impede the county. As a county board member, he did have a responsibility. He was part of the county board that appointed her. She reported ultimately to the county board. He received this letter in September of 2006, being passed from Duane Gray? That's correct. And the information concerned the events of August 11, 2006? Yes. Did he confront the plaintiff or anything else about this matter? Well, she wasn't at the office when he got there. I don't think he planned on getting there when she wasn't there. I'm not sure if he was trying to sidestep her. So she wasn't there, and then he made these statements to her staff. These are all people who worked for her? Yes. One person he didn't say anything to. It was just Ms. Sands. What would be the purpose in disclosing the entire contents of the letter to the employee or employees if his purpose was simply to determine whether there was reason for him to go forward and perhaps ask some more questions and either talk to the chair of the county board, the personnel committee, or whoever might be called upon to handle it? Well, I think that that would go to motivation, and I think right now we're under the badged sort of analysis to figure out whether or not he's within the scope of his employment. Well, how do we, unless we have all that evidence before us, I mean, the timing of what he did, the words he spoke, the words that were spoken back to him by the parties that he talked to, the further recourse he took in terms of going to the chair of the county board or referring this to a committee, whether there was rancor between the parties prior to this because of some dispute between the supervisor of assessments and the county board, all of that would go toward helping somebody answer the question as to whether or not he was trying to serve the master or whether he was in a tiff with this person or his moral code was affronted. I mean, all that sounds like fact-finding. I mean, that sounds like the thing that somebody would think about and have to decide as opposed to being a black and white immunity issue. Well, it becomes an immunity issue once you find that he's within the scope of his employment. Well, but how do we know if he's within the scope of his employment based on the things that I suggested? I mean, you could have such a case where it's clear that this person takes private glee in disclosing this and doesn't care and doesn't believe that the county board is ever going to discharge her because of this or do anything. Maybe they'd reprimand. I don't know what the process would be. And you could have a case where somebody is trying to be a good citizen and a good county board member and maybe handles it poorly but still has good motive. How do you know that at this juncture? I think you have to look at the whole context. The letter had these allegations in it. She was possibly slacking on her duties. She was doing things that might impugn her responsibilities as the county assessor. And she possibly fired somebody for reasons that weren't necessary or whatever they were. He took this letter to her office. He was a county assessor. He was an elected assessor, so he knew her. But at the same time, he was a county board member who had a responsibility to ensure that she was conducting her duties. So this was a retrospective inquiry. It wasn't going on at the moment. It had been at least a few weeks earlier. It seems to me if this is an inquiry, the appropriate thing to do would have said, he has this information to confront her with it and ask if it's true. But when he gets to her office and discovers she's not there, why are his remarks to her staff consistent with any appropriate role he's playing to ascertain what's going on? First of all, they don't sound like questions. They sound like statements, and statements not seeking information or responses or conclusions and commentary, don't they? Well, he brings the employee into the conference room, and he shows her the letter, and maybe it was to get her reaction from it. Which employee? Sams. Joyce Sams. And then he says to her, I have to take this letter to Greg Jackson, who's the overseer of the office. I have to take it to the board. I think that these comments are coming... What does he say? What does he say to Joyce Sams? That's what he says. He says, I have to take this letter to... That's all he says to her? Well, and he says, she's shacking up with Unzicker. He asks her about Chad Turner, the person who was fired. These are statements that are coming from a person who's concerned about Woodford County. But he doesn't ask Sams anything, does he? He doesn't say, what do you know about this letter, or what do you know about what's contained here? Well, her response after reading the letter was something along the lines of, I don't care who's sleeping with who, this doesn't matter. And he asks her about Chad Turner. What do you know about Chad Turner? I have to take this to Jackson. Who is Jackson, again? Jackson is the county administrator. He's the overseer of the office of the county supervisor of the assessments. So he ultimately reports to the board as well. I do think that we're getting past a very critical point in this analysis, and that is that the complaint itself, the verified complaint, alleges that in paragraph 10 and paragraph 15, the paragraph states that he was acting within his duties as a Woodford County board member. And paragraph 15 states that, and paragraph 15, by the way, is underneath count 2, within the emotional distress count, it states that he caused this emotional stress during the course of his job performance. She verified a complaint that states that he was acting within the scope of his employment. And that makes sense, because when she does that, she brings the Woodford County in as a defendant, under respondent superior, under indemnification. She also brings in the insurance of the Woodford County. If we were to conclude, notwithstanding any of this, that these statements were not within the scope of his employment, what would be the effect? First, what would be the effect on the county of Woodford? I'm not, if he's not within the scope of his employment, I'm not sure how any liability imputes the support of the county at that point. So there are statuses of defendants. So then what happens? Is there some liability in the estate of Pete Lambie? Are you representing the estate of Pete Lambie? The IMS. And at that point, if he's not within the scope of his employment, if it's just an intentional infliction of an emotional distress claim against Pete Lambie. Does that survive his death? That would survive his death. But then you would get into issues that were not decided by the circuit court, but that were presented to the circuit court as far as summary judgment on intentional infliction of emotional distress. And also absolute immunity. If you find that he's conducting quasi-legislative acts. I guess if he's not within the scope of his employment. Those were raised but not resolved by the trial court? That's correct. The trial court decided the case on 2210 and 2107. So the only thing we have here is really just a matter of the immunity for the county under the liability or total immunity provision? And of Pete Lambie, yes. And because arguments as to the court's interpretation of the tortuous act were not raised in the opening brief, I think really the only issue before this court is whether or not he was acting within the scope of his employment. And that issue is resolved from a reading of the complaint. From the verified complaint. Once you get into the analysis of Badgent and you try to determine his motivation. So it's your position that in pleading the plaintiff has conceded the issue about whether the remarks were made within the scope of his employment for purposes of the tort immunity statute? Certainly, Your Honor. It practically says that. Under paragraph 15 states, quote, in the course of performing their administrative, operational, and non-discretionary job responsibilities, defendants engaged in extreme or outrageous conduct with the intention of and with reckless disregard for causing emotional distress to the plaintiff. And the defendants are Lambie and County Woodford? I don't know how it gets much more clear than that. In the course of performing their job responsibilities. What was that? Non-discretionary job? In the course of performing their administrative, operational, and non-discretionary job responsibilities. And they might say those words for the purpose of pulling him out of 2201, which has a discretionary exception to it. You argue that to the trial court too? We argued 2201 to the trial court. I'm talking about the matter from the plaintiff's pleading? I know that the trial court ruled based on that language. I'm sure it was brought up. You don't recall if that was cited in reason to dismiss? I cannot recall in my brief at this moment if at that time we argued that he was within the scope of his employment based on the complaint. But I know that it was something we possibly assumed for the sake of our arguments. I know that I argued this in our responsive brief here before your honors. Thank you. I'm just flipping through the brief at this point. It would have to be that he was acting within the scope of his employment for tort immunity to be found in the first place. So whether it was something briefed or argued, or whether it was assumed within our arguments, then it would stand before this court. And I do remember appellate. No, it's argued in page 13. I see it in your brief. Thank you, your honor. I remember being raised at oral argument in front of the circuit court as well. So I suppose when you have language as clear as that, the court need look no further than the verified complaint to see that paragraph 10, paragraph 15, the fact that he was sued in his official capacity to conclude that he was acting within the scope of his employment. Moving past that, we must do the badgent analysis. His motivations appear from the circumstantial evidence in the contents of the letter and how he addressed the people in the office when he went in. Assuming that you find the scope of employment, I think that this court must uphold the circuit court's decision that he was immune under 2107 and 2210 because, if nothing else, the arguments weren't raised by the appellant in her opening brief. The arguments are waived. If you have nothing further, your honor. Thank you, counsel. Mr. Jackson, any rebuttal, sir? Just a very short rebuttal in response to some of the comments that the counsel made as to why Mr. Lambie was at the office that day. Ascribing any motive to Mr. Lambie at that point in time is pure speculation because there's nothing in the record that says he was there to see the plaintiff in that case to confront her about this letter. That's information that is the words of counsel, but it's not the facts of this case. That's why he took the letter to the office. If that was the case, he had every opportunity before he went into the office to talk directly to Ms. Lampkin, but he didn't avail himself of that opportunity. Instead, he talked to employees of hers about what she allegedly was doing. The second argument I want to make very quickly, they are equating the words in his capacity with words of scope of employment, and the two are not the same. I guess I could have said the same thing if I said as a county board member he was acting outside the scope of his employment. The words in his capacity were simply meant to identify him as a county board member who made these statements and connected him, therefore, to the county board. The complaint states, in the course of performing their administrative, operational, non-discriminatory job responsibilities. Non-discretionary job responsibilities. Why isn't that the statement that he was acting within the scope of his employment? Well, he was doing it as a county board member, but it was not a duty that he necessarily was performing at the time that he made these disparaging statements about the plaintiff in this case. You say in the course of all of that, his job responsibilities, he engaged in misconduct. Well, he's considered an employee under 201, I guess. 201 is the section, and so in keeping with that, instead of using the word employee... Which you're now arguing to us that he wasn't operating within the scope of his employment. That's my argument, that he was not. Why isn't that pleading saying he was? I'm still not sure I understand the difference here. Well, I guess we have a different interpretation of the language, Your Honor, but it was not intended to mean that he was a county board member and considered an employee under the act. But even as an employee, he still had to be working within the scope of his employment at the time that he uttered these statements. When you talk about interpretation, these are the words you use. I'm not interpreting them. In the course of performing his administrative operational non-discretionary job responsibilities, he engaged in misconduct. It seems to me that you're saying this is his conduct as a county employee. Well, I guess I can only say the intent of that pleading was to say that he was a county board member, which would, of course, mean if he was acting outside the scope of his employment, the county could be liable for any bad acts that he was doing. If he was just a joe ordinary citizen and made those statements, obviously the county wouldn't be in this case. I can only say that was my intent. Beyond that, the words capacity were intended to mean as a county board member that he was a county board member. I don't think the word capacity necessarily equates to the word scope of employment. There are certain things you have to do for it to be. That's a term of art, so to speak, where if you're doing these things and you're within the scope of your employment, and if you're not, then it's outside the scope of your employment. We're arguing that what he was doing on that particular day was outside his responsibilities as a county board member. Thank you, counsel.